## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

TIMOTHY PHILLIPS, GILBERTO
COLON, CHANDRA THOMAS,
KEVIN DUTY, TROY THOMPSON,
DENNIS HALTER, SHONDIS
ADAMS, SHIMON
MERRIWEATHER, CEDRIC REAMS,
LANIQUA KUYKENDALL,
CHARLOTTE A. DAVIS, ALICIA
ROSS, CARYN E. PRICE, LATASHA
GATLIN, CHRISTOPHER SEALS,
RONALD ANDERSON, TONYA
ESKILSON, ALVIN ARREAGA,
WALTER ORI, and CAROL WILL,
individually and on behalf of the class of
all persons who currently reside in Harry
Poe Manor or formerly resided therein at
any time from January 2011 to date,

       Plaintiffs,

       v.

WAUKEGAN HOUSING
AUTHORITY, a body politic and
corporate; CHARLES CHAMBERS,
individually and as Executive Director
of Waukegan Housing Authority; and
RENWICK CORNELIOUS,
individually and as Property Manager of
Harry Poe Manor; and TARA DANIEL,
individually and as Property Manager of
Harry Poe Manor,

       Defendants.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

No. 13-CV-08444

Judge John J. Tharp, Jr.

### MEMORANDUM OPINION AND ORDER

      A familiar nursery rhyme warns not to let the bedbugs bite. This case involves tenants of a

housing project who claim the property manager didn't do enough to protect them from these pests.

Current and former residents of Harry Poe Manor ("Poe Manor") have moved to certify a class

based on the defendants' allegedly inadequate response to a years-long bedbug infestation. The defendants contest certification on every possible ground, but certification is proper. The putative class members were exposed to a shared, pervasive risk of harm because, they allege, of deficiencies in the defendants' prevention and eradication measures. Their claims present common, foundational questions of fact and law that are best resolved by class litigation. Accordingly, the Court grants the plaintiffs' motion to certify the proposed class.

## BACKGROUND

Each of the named plaintiffs was a tenant of Poe Manor during some period between January 2011 and August 2018. Poe Manor is a 155-unit apartment building that participates in the U.S. Department of Housing and Urban Development Section 8 program for low-income tenants. The building is operated by the Waukegan Housing Authority ("WHA"), a public housing authority organized under 20 ILCS 3805/1 *et seq*. During the relevant period, WHA employed Charles Chambers as its executive director and Renwick Cornelious and Tara Daniels as property managers of Poe Manor. The plaintiffs allege that WHA, Chambers, Cornelious, and Daniels (collectively, "the defendants") concealed the full extent of the bed bug infestation at Poe Manor and failed to use effective methods to eradicate it.

Of the 428 head of household tenants who lived at Poe Manor between 2011 and August 2018, about 230 (53.7%) had at least one documented positive bedbug inspection or treatment for bedbugs in their unit when they were living in it; the remaining 198 or so (46.3%) did not. Defs.' Statement of Facts ("DSOF") ¶¶ 12, 17, ECF No. 157 (citing Defs.' Exs. 10, 10A, ECF Nos. 157-14, 157-15).[1] A January 2011 building-wide inspection revealed that 34 of Poe Manor's 155 units

---

[1] The defendants make this representation based on the compilation of data in Defendants' Exhibit 10A, which is based in part on the data in Plaintiffs' Exhibit 3A. *See* Defs.' Ex. 10, Kujawa Aff. ¶¶ 4, 7, ECF No. 157-14. Defendants' Exhibit 10A appears to contain two transcription errors relating to the inspection and treatment of tenant Chandra Thomas' unit: Plaintiffs' Exhibit 3A

(22%) were infested at that time. Another building-wide inspection in 2014 revealed that 37 units (24%) were infested at that time.

WHA first became aware of the bedbug infestation in 2010 or 2011. Defs.' Ex. 6, ECF No. 157-7 (showing payment for bed bug treatment in 2010); Pls.' Appx. 15–17, Ex. 1, McGuire Dep. 25:5–29:22, ECF No. 139-3 (stating that Smithereen Pest Management provided Poe Manor documentation showing bed bug activity found during January 2011 inspection); Defs.' Ex. 1, Chambers Dep. 17:6-24, ECF No. 157-2 (stating that Chambers first became aware of the infestation in October or November of 2011). Between November 2011 and August 2017, WHA procured roughly 489 professional bedbug inspections and 878 treatments at a cost of at least $116,822. From 2011 to 2018, 146 units (94.2%) were treated for bedbugs on at least one occasion. Sixty percent of the units treated received more than five treatments.

The plaintiffs allege that the defendants systemically failed to prevent and respond to the infestation, and the scope and duration of the infestation lends some support to that argument.

---

shows that Thomas' unit was inspected and treated while she lived in it, but Defendants' Exhibit 10A does not reflect the inspection or the treatment. *Compare* Pls.' Am. Ex. 3A at 1, Row 10, Columns L and M, ECF No. 161-1 (showing a July 21, 2014 inspection and a July 30, 2014 treatment in Thomas' unit, 207), *with* Defs.' Ex. 10A at 3, Unit 207, ECF No. 157-15 (showing no treatment or inspection in Thomas' unit when she lived there from May to November of 2014). Correction of this error would move Thomas from the category of tenants who did not have a documented positive inspection or treatment to the category of those who did. It also appears that Defendants' Exhibit 10A did not capture one of two treatments conducted in Laniqua Kuykendall's unit, No. 1003, during the time she lived there from September 2013 to November 2014. *Compare* Defs. Ex. 10A at 47, Unit 1003, ECF No. 157-15 (showing only one treatment between September 2013 and November 2014), *with* Pls.' Am. Ex. 3A, Row 142, Columns I and M, ECF No. 161-1 (showing a treatment in December 2013 and another in January 2014). Correction of this discrepancy would not change Kuykendall's categorization as a tenant who had a documented positive inspection or treatment. Correction of other such discrepancies may or may not move a tenant from one category to another. The plaintiffs have not contested the accuracy of these figures, and considering the overall volume of data, these discrepancies do not undermine the Court's confidence that the defendants' representations regarding the number of tenants who had a documented positive inspection or treatment are generally accurate. That said, some of these discrepancies suggest that the data underreports the severity of the infestation. *See, e.g., infra* n.5.

Specifically, the plaintiffs contend that the defendants did not conduct bedbug inspections frequently enough, used conventional rather than heat treatment, did not conduct "cloverleaf" inspections whereby the four units surrounding an infested unit are also inspected or treated, failed to adequately treat common areas, failed to use effective prophylactic measures, failed to conduct recommended follow-up treatments, and otherwise did not promptly respond to the infestation using effective eradication techniques.

The plaintiffs also allege that the defendants suppressed tenant communications about the infestation and attempted to conceal from the tenants information about the full extent of the infestation. WHA handed out bedbug notices, hung bedbug posters, and held seminars to educate its tenants on how to limit the spread of bedbugs. But the plaintiffs contend that was not enough to adequately inform the tenants about the infestation. For example, plaintiff Chandra Thomas claims that no WHA employee told her about the bed bug infestation at Poe Manor when she moved in, *see* Defs. Ex. 13, Thomas Dep. 120:21–121:17, ECF No. 157-18, and plaintiff Alicia Ross claims that WHA did not disclose the extent of the infestation to her through educational meetings or otherwise, *see* Defs.' Ex. 20, Ross Dep. 30:2-14, ECF No. 157-25.

The plaintiffs contend that the defendants' inadequate response to the bedbug infestation endangered residents and contributed to the creation of an unlivable environment at Poe Manor. Tenants reported that the infestation caused them to develop skin conditions and suffer from symptoms of anxiety, sleeplessness, and post-traumatic stress. The plaintiffs assert their claim to relief premised on theories of willful and wanton violations of constitutional rights and federal health and safety regulations (Count I), statutory deceptive acts and practices (Count II), unjust enrichment (Count III), breach of warranty of habitability (Count IV), breach of contract (Count V), and premises liability (Count VI). This Court previously denied the defendants' motions to

dismiss, holding that the plaintiffs have stated a plausible claim pursuant to 42 U.S.C. § 1983 under, at least, the state-created danger doctrine. Order denying Defs.' Mot. to Dismiss for Failure to State a Claim 5, ECF No. 33 (holding that Court was "not prepared to find, at the motion to dismiss stage, that a fully developed factual record could not show that the defendants in this case took reckless actions that created or exacerbated a danger for the plaintiffs, causing them injury"); *see also* Order denying Defs.' Mot. to Dismiss for Lack of Subject Matter Jurisdiction 4, ECF No. 16 (holding that "the plaintiffs have asserted a colorable § 1983 claim and dismissal based on Rule 12(b)(1) is not appropriate").

Class discovery has been completed, ECF No. 153, and the plaintiffs now move pursuant to Federal Rule of Civil Procedure 23 to certify their proposed class, which is defined as:

> All persons who currently reside in Harry Poe Manor ("Poe Manor")
> or formerly resided therein at any time from January 2011 to date.

Pls.' Mot. for Class Certification, Appointment of Class Representatives and Appointment of Class Counsel ("Mot.") 2, ECF No. 139. The defendants respond that none of the plaintiffs' causes of action are viable except its cause of action pursuant to 42 U.S.C. § 1983, that the plaintiffs' proposed class is "fatally overbroad," Defs.' Resp. to Pls.' Mot. 5, ECF No. 156, and the resolution of contested issues requires individualized proof not suitable to class action litigation. The plaintiffs maintain that the class is appropriately defined and that the common questions predominate over questions affecting only individual putative class members.

The plaintiffs also request that the following individuals be named as class representatives: Timothy Phillips, Gilberto Colon, Chandra Thomas, Kevin Duty, Troy Thompson, Dennis Halter, Shondis Adams, Shimon Merriweather, Cedric Reams, Laniqua Kuykendall, Charlotte A. Davis, Alicia Ross, Caryn E. Price, Latasha Gatlin, Christopher Seals, Ronald Anderson, Tonya Eskilson, Alvin Arreaga, Walter Ori, and Carol Will. In addition, the plaintiffs seek the appointment of their

counsel as counsel for the class: Amy Lonergan of Finn & Finn, Ltd.; Jed H. Stone of Stone & Associates; Jeff Lipman of Lippman Law Firm; and Steven P. Wandro of Wandro & Associates, PC.

## DISCUSSION

### I.     Standard for Class Certification

To obtain certification of a class, Federal Rule of Civil Procedure 23(a) requires the named plaintiffs to show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." The plaintiffs must also show that the proposed class meets one of the criteria set forth in Rule 23(b). The plaintiffs assert that they have done so via Rule 23(b)(3), which provides that the class action may be maintained if

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> >
> > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> >
> > (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> >
> > (D) the likely difficulties in managing a class action.

The class must also be "sufficiently definite that its members are ascertainable." *Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 864 (7th Cir. 2018) (citation omitted). The plaintiffs bear the burden of

making these showings by a preponderance of the evidence. *Messner v. Northshore Univ. Health System*, 669 F.3d 802, 811 (7th Cir. 2012).

## II.     Ascertainability and Breadth of Class

The defendants maintain that the plaintiffs' proposed class is not ascertainable and is overbroad because roughly half of the putative class members never had a documented inspection or treatment of their unit and so could not have been victimized by bedbugs. As a threshold matter, the requirement of "ascertainability" means that the class must be "defined clearly and based on objective criteria." *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659 (7th Cir. 2015).[2] The putative class here is defined based on the objective and readily ascertainable criteria of whether an individual was a tenant during the relevant period. That criterion plainly makes membership in the defined class readily ascertainable, at least as the Seventh Circuit has defined that requirement.

What the defendants focus on is really not whether the putative class is ascertainable but whether it is too broad. The Seventh Circuit has held that a class should not be certified "if it sweeps within it persons who could not have been injured by the defendant's conduct or if it is apparent that it contains a great many persons who have suffered no injury." *Lacy*, 897 F.3d at 864 (cleaned up). The defendants contend that the proposed class definition sweeps too broadly because the plaintiffs have not shown that tenants whose units did not have a documented positive inspection or formal treatment while they were living in it were harmed by the infestation. They argue the statistics show that roughly half (about 46.3%) of the tenants did not have a positive inspection or any treatment (prophylactic or otherwise) in their unit when they were living in it.

---

[2] In *Mullins*, the Seventh Circuit held that, in this Circuit at least, the requirement of ascertainability does not implicate the question of the feasibility of proving membership in a proposed class. Ascertainability turns on the adequacy of the class definition, not on "the potential difficulty of identifying particular members of the class and evaluating the validity of claims they might eventually submit." *Id*. at 657–58.

To support this argument, the defendants principally rely on the chart they prepared showing that nearly half of the tenants did not have a documented positive inspection or formal treatment for bedbugs in their unit when they were living in it. DSOF ¶¶ 12, 17; Defs.' Exs. 10, 10A, ECF Nos. 157-14, 157-15.

But evidence that more than half of all tenants reported bedbug infestations does not support an inference that the remaining minority of residents did not also suffer from bedbugs. To the contrary, there is ample evidence in the record to support an inference that tenants without a formal inspection or treatment may have been harmed by the bedbugs.[3] The infestation was widespread, longstanding, and severe. More than half of the tenants had a documented positive bedbug inspection or treatment during the time they lived in their unit, and the parties agree that "if there was a documented bedbug treatment or bedbug inspection with a positive finding in a particular unit at a particular time, then it is more likely than not that the unit contained bedbugs at that particular time." DSOF ¶ 13. Roughly 94% of units were documented to have been infested at some point over the past eight years. Poe Manor maintenance worker Victor Agosto testified that he "was constantly coming into contact with bedbugs in Poe Manor, seeing them in apartments on every floor, some more infested than others, and observing bedbugs in public areas of the building," and that he found bedbugs in furniture, bedding, walls, elevators, hallways, and the garbage room. Pls.' Appx. 75, Ex. 4, Agosto Aff. ¶¶ 3, 7, 9, 10, ECF No. 139-3. Agosto further testified that units he reported to his supervisor as "severely infested" were not always added to the list of units to be inspected and treated, and if a unit was inspected, sometimes no bedbugs were found during the inspection and no treatment was scheduled. *Id.* ¶¶ 22–23. Some tenants have

---

[3] The Court reaches that conclusion even without considering the opinions of entomologist, Dr. Michael F. Potter, which were not disclosed until set forth in the plaintiffs' reply brief. *See* Pls.' Reply Br. in Supp. of Their Mot. ("Pls.' Reply"), Potter Aff., ECF No. 160-1.

also asserted that their complaints were disregarded, and for at least some such tenants, there is no documented positive inspection or treatment in their unit during the time they were living in it. *See, e.g.*, Pls.' Appx. 235–36, Ex. 26 at 2–3, Pl. Jarvis Leflore's Responses to Defs.' First Set of Interrogs., Answers # 2–3 (stating that tenant Jarvis Leflore complained to Daniels about bedbugs soon after moving into Poe Manor and that he eventually stopped complaining "because it seemed like nothing would come of it"); Defs.' Ex. 10A at 4, Unit 208[4] (showing no positive inspection or treatment in the unit of Jarvis L. during the time he lived in it); *see also, e.g.*, Pls.' Appx. 252, Ex. 28 at 4, Pl. Starr Nutall's Responses to Defs.' First Set of Interrogs., Answer # 3 (stating that tenant Starr Nutall complained to WHA "at least 20 times"); Defs.' Ex. 10A at 8, 34, Unit 303, Unit 716 (showing no positive inspection or treatment in either unit Starr N. lived in while she lived in the unit).[5]

Other tenants may similarly have thought it futile to report the problem or have failed to do so for myriad other reasons. They may have been too embarrassed to report the problem and have tried to resolve it themselves. They may have availed themselves of other housing alternatives, failed to correctly identify source or cause of the bedbug bites, or believed that the complaints of other tenants would lead to an adequate resolution of the issue. Tenant James Butler, for example, reports suffering from bed bug bites shortly after he moved in to Poe Manor and that he "moved out . . . around February 2012 because [he] could no longer stand the bedbugs, which

---

[4] The plaintiffs' statement of facts appears to misidentify Leflore's unit as No. 1003. *Compare* PSOF ¶ 171, *with* Pls.' Appx. 234, Ex. 26 at 2, Pl. Jarvis Leflore's Responses to Defs.' First Set of Interrogs., Answer # 1.

[5] Nutall testified that her unit was treated. *See* Pls.' Appx. 252, Ex. 28 at 4, Pl. Starr Nutall's Responses to Defs.' First Set of Interrogs., Answer # 3. But the chart the defendants prepared, Defs.' Ex. 10A, does not show any corresponding inspection or treatment of either unit in which she lived while she was living in it. The absence of a documented treatment or inspection in either of Nutall's units is another reason to believe that the records compiled by the defendants do not capture the full extent of the infestation.

[he] was not told about when [he] moved in." Pls.' Appx. 124, Ex. 11 at 2–3, Pl. James Butler's Responses to Defs.' First Set of Interrogs., Answers # 1–2. The records, however, show no positive inspection or treatment in the unit of "James B." while he lived there. Defs' Ex. 10A at 33, Unit 711. While the absence of a report or treatment during a tenant's term of residency is certainly relevant evidence as to whether there was an infestation, it cannot reasonably be regarded as dispositive of that issue.

As it pertains to the defendants' argument about the breadth of the proposed class, then, what can be said definitively is that, *__at a minimum__*, over half of the tenants experienced a bedbug infestation while living at Poe Manor, and there were likely more. That conclusion does not warrant a determination that the proposed class is overbroad because it sweeps in too many persons who could not have been harmed by the alleged misconduct. Indeed, there is no basis on the present record to infer that there are any members of the putative class who "could not" or "have not" been harmed by that conduct. Each tenant who lived in Poe Manor during the relevant time could well have been harmed by the defendants' allegedly inadequate response to the infestation.

This is not, then, a case like *Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006), on which the defendants rely. In *Oshana,* it could reasonably be assumed that, of the millions of putative class members who consumed a fountain Diet Coke during the class period, many were aware that it contained saccharine. Indeed, in *Oshana* the evidence supported that assumption because even the plaintiff herself acknowledged that she drank Diet Coke after learning that it had saccharin. *Id*. at 514. Here, by contrast, the evidence on which the defendants rely for their argument that many members of the class were not harmed cannot bear that weight; the defendants have not pointed to any evidence suggesting that some subset of the Poe Manor tenants could not have been harmed. *See, e.g., Messner*, 669 F.3d at 825–26 (rejecting overbreadth argument where

defendant's brief did "not call [the Seventh Circuit's] attention to even a single contract" showing that certain proposed class members could not have been harmed, "let alone provide any basis to believe that a 'great many' putative class members entered into such contracts").

The sheer scale of the overbreadth problem in *Oshana* also distinguishes that case. In *Oshana*, there were potentially millions of people who fit within the proposed class definition but who were not harmed by the alleged misconduct; here, there are somewhere between zero and 198. Overbreadth on that modest scale simply does not present the difficulties that present themselves in a case of *Oshana*'s magnitude. This is a case more like *Lacy*, in which the Seventh Circuit declined to assume that a far smaller group of persons had not been injured by the defendants' alleged failures to provide ADA-compliant ramps at County Courthouses. 897 F.3d 847. *Lacy* and this case both involve relatively small groups of persons who could have been subjected to a continuing and common course of alleged misconduct.

In *Lacy*, the Court also confirmed that "[t]here is no precise tipping point at which a class includes too many people who have not been harmed. 'Such determinations are a matter of degree, and will turn on the facts as they appear from case to case.'" *Lacy*, 897 F.3d at 864 (quoting *Messner*, 669 F.3d at 825). Here, the defendants readily concede the migration of bed bugs from one unit to another was an eventuality that they felt the need to protect against, *see* Defs.' Sur-reply to Pls.' Mot. 16, ECF No. 176 (stating that defendants procured treatments to prevent spread of bed bugs from one unit to another), and those bedbugs are documented to have afflicted, at one time or another, nearly every single unit at Poe Manor. In view of the fair possibility that some tenants did not report bedbug problems and the relatively small number of persons who might be included in the class despite not having bedbug problems, including "all tenants" of Poe Manor during the relevant period within the class definition does not preclude certification of the class.

*See Bell v. PNC Bank Nat. Ass'n*, 800 F.3d 360, 380 (7th Cir. 2015) ("A class will often include persons who have not been injured by the defendant's conduct, but this possibility or, indeed inevitability, does not preclude class certification.").[6] All of the tenants shared a common risk of harm from the defendant's actions (or inactions), and given that the basis of the suit is the defendants' failure to adequately respond to the infestation, it would be anomalous to use an output of that allegedly inadequate response (Poe Manor's documentation of positive inspections and treatments) as a mechanism to exclude tenants from the class. The proposed class definition identifies a particular group of individuals (tenants) plausibly harmed by the defendants in a particular way (the defendants' alleged failure to adequately respond to the bedbug infestation) during a specific period (January 2011 to present) in a particular area (Poe Manor). It is therefore ascertainable and not overly broad. *See Mullins*, 795 F.3d at 659–60 ("To avoid vagueness, class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way.").

## III.    Numerosity

Remarkably, given that the number of potential class members is in the hundreds, the defendants challenge numerosity. Numerosity is satisfied where it is reasonable to believe that the proposed class is "large enough to make joinder impracticable." *Arnold Chapman & Paldo Sign & Display Co. v. Wagner Equities, Inc.*, 747 F.3d 489, 492 (7th Cir. 2014). While there is no magic number, forty or more members is generally considered to be sufficient to satisfy the numerosity

---

[6] Even if the Court concluded that the class as proposed is too broad, that would not preclude certification of a more narrow class. The obvious alternative would be to certify a class of only those tenants who are documented to have had a positive bedbug inspection or treatment during the time they were living in the unit. But because a class so defined would likely exclude some number of tenants who experienced but did not report bedbug infestations, and because the number of potential class members as to whom there is such uncertainty is small, the Court concludes that it is more appropriate to certify the class as the plaintiffs have defined it.

requirement. *See, e.g.*, *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001) ("No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."); *Gordon v. Caribbean Cruise Line, Inc.*, 2019 WL 498937, at *6 (N.D. Ill. Feb. 8, 2019); *Barnes v. Air Line Pilots Assoc., Int'l*, 310 F.R.D. 551, 557 (N.D. Ill. 2015); *Oplchenski v. Parfums Givenchy, Inc.*, 254 F.R.D. 489, 495 (N.D. Ill. 2008). And when considering numerosity, courts should also consider, in addition to the number of plaintiffs, the putative class members' geographic diversity, judicial economy, and the ability of the putative class members to institute individual lawsuits. *Tenants Associated for a Better Spaulding (TABS) v. U.S. Dept. of Housing and Urban Development*, 97 F.R.D. 726, 729 (N.D. Ill. 1983).

This is not a close call. During the relevant time, there were over 400 head of household tenants at Poe Manor. Considering that more than one tenant lived in many units, the putative class includes many more people as well. Poe Manor's tenants also qualified for reduced-rent housing; most of them are likely to lack the means or resources to litigate their cases on their own. Further, it is far from clear that the damages recoverable for individual plaintiffs would make it cost effective to litigate these claims individually. Numerosity is easily satisfied.

## IV.    Commonality

The proposed class also satisfies the commonality prong of Rule 23(a).

> [C]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury at the hands of the same defendant. But it's not enough for the plaintiffs to show that class members have all suffered a violation of the same provision of law. Instead they must show that the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members. The critical point is the need for conduct common to members of the class. Put somewhat differently, the class members' claims must depend on a common contention that is capable of classwide resolution.

*McMaster v. Darden Restaurants, Inc.*, 845 F.3d 794, 800 (7th Cir. 2017) (internal citations, quotation marks, and emphasis omitted). A "common contention . . . is capable of classwide resolution" if "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Determining whether the defendants' systemic response to the bedbug infestation was adequate will do just that. Common questions include whether the defendants should have used a different methodology such as heat treatments or the cloverleaf method whereby the four units surrounding an infested unit are treated; whether the defendants should have conducted more frequent inspections or implemented more comprehensive preventive measures; whether the defendants adequately inspected and treated common areas; and whether the defendants misled tenants about the infestation or exacerbated the infestation by suppressing communications about it. In addition, there are questions about whether the defendants' actions on behalf of one tenant can be viewed in isolation from the actions taken with respect to another. If, for example, the defendants ordered that one set of units be sprayed with pesticides but not others, then the pesticides may have simply driven the bed bugs from one set of units into another while accomplishing little to eradicate the pests. The Court would need to inquire into these questions to determine the defendants' liability to any individual tenant because the proof required to answer those questions is relevant to the claims of each individual tenant. The defendants' response to the bedbug infestation therefore raises a central and common issue of liability. *Cf. Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (holding that class should be certified because there was "a single, central, common issue of liability: whether the [defendant's] washing machine was defective").

The defendants rely heavily on *Phillips v. Sheriff of Cook County*, 828 F.3d 541, 550 (7th Cir. 2016), in which the Seventh Circuit affirmed the district court's decertification of a class of prisoners alleging deliberate indifference to their dental needs. There was no common question capable of classwide resolution in *Phillips*, the Seventh Circuit held, because the "detainees each present[ed] a different situation that involved a different type of dental pain, took place at a different time, involved different medical professionals and prison staff, and concerned a different alleged deficiency in the treatment process." 828 F.3d at 555. The Seventh Circuit explained that a different result might have been warranted if the plaintiffs had presented "classwide evidence that [the prison was] engaging in a policy or practice which rises to the level of a systemic indifference." *Id.* at 557. Here, classwide evidence of the defendants' alleged deficiencies in the policies and procedures the defendants employed in responding to the bed bug infestation exists; while there may be individual questions about the adequacy of the defendants' actions with respect to individual complaints, it is the defendants' alleged failure to adequately respond to the bedbug infestation in Poe Manor as a whole that constitutes "conduct common to members of the class which advances the litigation." *Id.* (internal quotation mark and citation omitted). The complaint in this case alleges systemic failures by the defendants, but it was only the mitigation of the systemic failure to provide timely dental care that made decertification of the class in *Phillips* appropriate, notwithstanding the questions about the adequacy of individual treatment. Once the Jail had remedied the staffing issue that commonly affected all of the class members, "there [was] no longer a single question the answer to which would resolve a significant issue in the case." *Id.*

at 553.[7] But here, the questions about the adequacy of the actions common to all class members remain. The commonality requirement of Rule 23(a)(2) is therefore satisfied.

## V.     Typicality and Fair Representation

The typicality requirement of Rule 23(a) requires the Court to evaluate "whether [the plaintiffs'] claims arise from the same events or course of conduct that gives rise to the putative class members' claims." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1026 (7th Cir. 2018). "The individual claims may feature some factual variations as long as they have the same essential characteristics." *Id.* (citation and quotation marks omitted). With respect to typicality, the defendants merely reassert the arguments they made with respect to the absence of commonality among the claims of class members. Those arguments are no more persuasive in the context of a discussion regarding typicality. Although the defendants may intend to defend themselves by arguing that they responded adequately to some bedbug complaints even if they responded inadequately to others, or by arguing that some tenants exacerbated the bedbug problem by failing to follow pest management instructions, "typicality under Rule 23(a)(3) should be determined with reference to the [defendants'] actions, not with respect to particularized defenses [they] might have against certain class members." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 725 (7th Cir. 2011) (citing *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996)).

As to the adequacy of the plaintiffs' representation of the putative class, the defendants argue that the representative plaintiffs will not adequately represent the interests of tenants who may be aware of the defendants' alleged concealment of information or suppression of

---

[7] *Phillips* involved the decertification of a class for injunctive relief only, *see* Fed. R. Civ. P. 23(b)(2)), so the Court had no occasion to address whether claims for damages for past injuries sufficed to provide a common question as to the class. The plaintiffs here, by contrast, seek both injunctive relief and damages for past conduct.

communications regarding bed bugs because none of the representative plaintiffs have been shown to have personal knowledge of such concealment or suppression. At least two representative plaintiffs, however, have testified that information regarding the infestation was concealed from them. *See* Defs. Ex. 13, Thomas Dep. 120:21–121:17 (testifying that no WHA employee told her about Poe Manor's bed bug infestation when she moved in); *see also* Defs.' Ex. 20, Ross Dep. 30:2-19 (denying that the defendants disclosed extent of infestation to her through educational meetings or otherwise). And even aside from whether the representative plaintiffs would independently be entitled to relief based solely on the defendants' alleged concealment, the representative plaintiffs and the other class members alike will be incentivized to uncover evidence that the defendants suppressed information concerning the extent of the infestation. Even a tenant who was never herself deceived about the bedbug infestation could have been harmed by the defendants' deception or silencing of other tenants if such deception or silencing contributed to the infestation of her unit.

In determining whom to appoint as class counsel, the Court must consider the factors set forth in Federal Rule of Civil Procedure 23(g)(1)(A), including the previous work counsel has done in the case, counsel's experience handling similar cases, counsel's knowledge of applicable law, and counsel's willingness to commit financial resources to case. Plaintiffs' counsel have been involved in depositions and discovery in this case for years and have filed detailed pleadings regarding the putative class claims and applicable law. They have also proffered that they have significant experience litigating similar cases and that they are committed to dedicating sufficient financial resources to the action. The representative plaintiffs and counsel have "sufficient interest in the outcome to ensure vigorous advocacy." *Chapman v. Worldwide Asset Mgmt., LLC*, No. 04-c-7625, 2005 WL 2171168, at *4 (N.D. Ill. Aug. 30, 2005).

## VI.    Predominance and Superiority

The questions of law and fact common to the class as defined by the Court predominate over questions affecting only individual class members.

> Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication. Or, to put it another way, common questions can predominate if a common nucleus of operative facts and issues underlies the claims brought by the proposed class. . . . Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole.

*Messner*, 669 F.3d at 815 (cleaned up). Analyzing the predominance question "begins, of course, with the elements of the underlying cause of action." *Id.* (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2184 (2011)). But a "court weighing class certification must walk a balance between evaluating evidence to determine whether a common question exists and predominates, without weighing that evidence to determine whether the plaintiff class will ultimately prevail on the merits." *Bell*, 800 F.3d at 377.

As this Court explained in its previous rulings denying the defendants' motions to dismiss, failure to adequately respond to a bed bug infestation may subject defendants to liability under the state-created danger doctrine. *See* ECF Nos. 16, 33; *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (complaint stated § 1983 claim because it alleged that defendants' only effort to address prolonged and severe pest infestation was conducting two pest-control sprayings); *Mathias v. Accor Economy Lodging, Inc.,* 347 F.3d 672, 675 (7th Cir. 2003) (motel's failure to inform guests of bedbug infestation qualified as "willful and wanton" conduct under Illinois law).[8]

---

[8] Under Illinois law, "willful and wanton conduct" includes acts "committed under circumstances exhibiting a reckless disregard for the safety of others." *Chelios v. Heavener*, 520 F.3d 678, 693 (7th Cir. 2008) (quoting *Carter v. Chi. Police Officers*, 165 F.3d 1071, 1081 (7th

To prevail on a state-created danger theory, the plaintiffs must show that (1) the state, by affirmative acts, created or increased a danger to plaintiffs, (2) the state's failure to protect the plaintiffs from the danger was the proximate cause of the plaintiffs' injury, and (3) the state's failure to protect the plaintiffs shocks the conscience. *McDowell v. Vill. of Lansing*, 763 F.3d 762, 766 (7th Cir. 2014) (explaining that reckless action and deliberate indifference to a person's welfare may be sufficient to give rise to constitutional violation).

As discussed in Section IV *supra*, the adequacy of the defendants' systemic actions to address the bedbug infestation presents common questions for the members of the class. If the evidence in this case shows that the defendants' practices in responding to the bedbug infestation were reckless or exhibited a deliberate indifference to the tenants' welfare, then that "same evidence will suffice for each member to make a prima facie showing" of liability. *Messner*, 669 F.3d at 815. The alleged inadequacy of the defendants' response to the bed bug infestation constitutes the "common nucleus of operative facts and issues" underlying the claims brought by the class, "represent[s] a significant aspect" of the case, and "can be resolved for all members of a class in a single adjudication." *Id*. All the individual plaintiffs will likely need to have questions answered regarding the adequacy of the defendants' systemic response for there to be a determination made as to liability in any one of those cases. It would therefore be more efficient for those plaintiffs to seek answers to those common questions as a class rather than asking the same questions as to the adequacy of the building-wide response in hundreds of individual cases. For that reason, a class action is superior to other methods to fairly and efficiently adjudicate the

---

Cir. 1998)). This is similar to the reckless indifference standard that applies in many § 1983 due process cases.

controversy. It would be inefficient to resolve on a tenant-by-tenant basis, by way of example, such questions as whether the defendants' approach to treating common areas was deficient.

There are, to be sure, differences among class members, and individual questions no doubt exist. The plaintiffs point out, for example, that "[o]nly one treatment was done to address [a] tenant's infestation in the 24 years she resided in the first unit, which was treated 11 times during the next person[']s residency in that unit." Pls.' Reply 6, ECF No. 160 (citing Def.'s Ex. 10A, at 51, Unit 1016). But the presence of such individualized questions does not preclude certification of the class. *See Bell*, 800 F.3d at 379 ("The fact that the plaintiffs might require individualized relief or not share all questions in common does not preclude certification of a class."); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (need for individual proof alone does not necessarily preclude class certification). These individualized questions become relevant only if it is established that the defendants' systemic response to the infestation was adequate. The common questions as to the systemic actions the defendants took, or failed to take, to address the bedbug infestation are foundational; if an adequate response would have prevented the further infestation to other tenants and prevented years of problems, then the actions the defendants took in response to individual complaints diminish in significance. In short, the foundational common questions relating to the defendants' systemic response to the infestation predominate over the secondary questions relating to the defendants' response vis-à-vis the problems that individual tenants were reporting.

Further, if differences among class members emerge or become more prevalent, those differences may be litigated at a later phase of the proceedings, subclasses may be certified, or both. *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) ("Neither Rule 23 nor any gloss that decided cases have added to it requires that ***every*** question be common. It is routine

in class actions to have a final phase in which individualized proof must be submitted.") (emphasis in original); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification."); *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012) ("It is premature to declare the alleged conflicts of interest an insoluble bar to the class action."). And finally, it bears noting that should individualized issues prove to be more significant, or burdensome, than anticipated, Rule 23(c)(4) permits the Court to maintain a class action only as to common issues. *See, e.g., McMahon v. LVNV Funding, LLC*, 807 F.3d 872, 876 (7th Cir. 2015) ("It is well established that, if a case requires determinations of individual issues of causation and damages, a court may bifurcate the case into a liability phase and a damages phase.").

*       *       *

For the reasons stated above, the Plaintiffs' Motion for Class Certification, Appointment of Class Representatives and Appointment of Class Counsel, ECF No. 139, is granted. The following class is certified:

> All persons who resided in Harry Poe Manor at any time from January 1, 2011 to April 22, 2019.[9]

In addition, the plaintiffs' proposed class representatives are appointed: Timothy Phillips, Gilberto Colon, Chandra Thomas, Kevin Duty, Troy Thompson, Dennis Halter, Shondis Adams,

---

[9] As formulated by the plaintiffs, the proposed class would be defined as: "All persons who currently reside in Harry Poe Manor or formerly resided therein at any time from January 2011 to date." The Court has modified that definition somewhat as there is no reason for the class definition to distinguish between current and former residents and because the Court declines to certify as members of the class persons who have not yet resided in Poe Manor.

Shimon Merriweather, Cedric Reams, Laniqua Kuykendall, Charlotte A. Davis, Alicia Ross, Caryn E. Price, Latasha Gatlin, Christopher Seals, Ronald Anderson, Tonya Eskilson, Alvin Arreaga, Walter Ori, and Carol Will. The plaintiffs' proposed class counsel are also appointed: Amy Lonergan of Finn & Finn, Ltd.; Jed H. Stone of Stone & Associates; Jeff Lipman of Lippman Law Firm; and Steven P. Wandro of Wandro & Associates, PC.

Dated: April 22, 2019

John J. Tharp, Jr.
United States District Judge