## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY PHILLIPS, GILBERTO COLON, CHANDRA THOMAS, KEVIN DUTY, TROY THOMPSON, DENNIS HALTER, SHONDIS ADAMS, SHIMON MERRIWEATHER, CEDRIC REAMS, LANIQUA KUYKENDALL, CHARLOTTE A. DAVIS, ALICIA ROSS, CARYN E. PRICE, LATASHA GATLIN, CHRISTOPHER SEALS, RONALD ANDERSON, TONYA ESKILSON, ALVIN ARREAGA, WALTER ORI, and CAROL WILL, individually and on behalf of the class of all persons who currently reside in Harry Poe Manor or formerly resided therein at any time from January 2011 to April 22, 2019, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 13-CV-08444 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| WAUKEGAN HOUSING AUTHORITY, a body politic and corporate; CHARLES CHAMBERS, individually and as Executive Director of Waukegan Housing Authority; and RENWICK CORNELIOUS, individually and as Property Manager of Harry Poe Manor; and TARA DANIEL, individually and as Property Manager of Harry Poe Manor, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

The plaintiffs represent a certified class of individuals who resided in Harry Poe Manor

("Poe Manor"), a ten-story multifamily public housing apartment building in Waukegan, Illinois,

from January 1, 2011, to April 22, 2019. They are suing the defendants for inadequately responding

to a prolonged bedbug infestation. The defendants are the Waukegan Housing Authority ("WHA"), which is the public housing authority that operates Poe Manor; Charles Chambers, the WHA's executive director; and two of Poe Manor's former property managers, Renwick Cornelious and Tara Daniel. The plaintiffs assert three theories of relief on behalf of the class: violation of their Fourteenth Amendment substantive due process rights under 42 U.S.C. Section 1983, unjust enrichment under Illinois law, and breach of contract under Illinois law.[1] The defendants have moved for summary judgment on the grounds that the plaintiffs cannot prove the elements of their claims as a matter of law and that qualified immunity shields the defendants from the § 1983 claim. For the following reasons, the Court grants in part and denies in part the defendants' motion for summary judgment. The defendants are entitled to judgment as a matter of law on the § 1983 substantive due process and pendent unjust enrichment theories; the plaintiffs may go to a jury, however, on their breach of contract theory.

## FACTUAL BACKGROUND[2]

Poe Manor is a 155-unit apartment building in Waukegan, Illinois. It participates in the U.S. Department of Housing and Urban Development Section 8 program for disadvantaged, low-income tenants. It is subsidized by HUD and subject to certain HUD regulations governing eligibility for subsidized housing, terms of rent and payment, and housing quality standards, among other things. Per these regulations, Poe Manor residents pay only a limited percentage of

---

[1] Contemporaneously with their response to the motion for summary judgment, the plaintiffs filed a motion for leave to amend their complaint, primarily to eliminate several other causes of action. ECF No. 245. The Court granted leave to amend. ECF No. 247. The Sixth Amended Complaint, ECF No. 244, is the operative class action complaint.

[2] The facts set forth below are undisputed unless otherwise noted. Some facts are undisputed for the purposes of this motion for summary judgment only.

their adjusted income to the WHA as rent. *See* Pls.' Resp. to DSMF[3] ¶¶ 1-2. The WHA has written leases with each of the Poe Manor tenants.

*The Defendants' Obligations Under the Residential Leases*

The record does not contain any complete and authenticated Poe Manor lease agreements for any of the named plaintiffs or class members.[4] The record contains only a one-page excerpt of a Poe Manor lease between the WHA and an unidentified tenant, which includes the following provision (hereafter, the "Lease Provision"):

> In addition to other obligations of Management under this Lease, Management agrees:
>
> (a)　To Maintain the Premises and the development in a decent, safe and sanitary condition.
>
> (b)　To comply with the requirements of applicable building and housing codes and regulations of the U.S. Department of Housing and Urban Development materially affecting health and safety.
>
> (c)　To make necessary repairs to the Premises.
>
> (d)　To keep development buildings, facilities and common areas not otherwise assigned to Tenant for maintenance and upkeep in a clean and safe condition.

Ex. J to Pls.' Complaint (ECF No. 1-1) at 47.[5]

Despite the absence of complete tenant leases from the record, a few key facts surrounding them are known. The defendants do not deny there is a lease between each tenant and the WHA.

---

[3] The Court will use "DSMF" in reference to defendants' statement of material facts, ECF No. 228, filed pursuant to Local Rule 56.1(a)(1)(3), and "PSMF" in reference to the plaintiffs' statement of material facts, ECF No. 240 at Part II.

[4] The plaintiffs moved to secure judicial notice of several leases after failing to follow through on their attempts to obtain relevant leases through offensive discovery. The Court denied the motion for the reasons stated in its prior order. *See* ECF No. 247.

[5] The top-half of the excerpt contains additional lease terms that are not relevant to this litigation.

Defs.' Memo. (ECF No. 229) at 15. Defendant Daniel further affirmed in her deposition testimony that "the Waukegan Housing Authority at Poe use[d] a standard[] HUD lease with tenants." DSMF Ex. 5 (ECF No. 228-5) at 17:9-13. The defendants also admit that the Lease Provision is included in its leases with class members; their answer to the Fifth Amended Complaint admits the plaintiffs' allegation that:

> Defendants' lease form for Poe Manor provides that management's obligations, inter alia, are "to maintain the Premises and the development in a decent, safe and sanitary condition, (and) to comply with the requirements of applicable building and housing codes and regulations of the U.S. Department of Housing and Urban Development materially affecting health and safety . . . ." A copy of a portion of this lease form was attached to the Original Complaint as Exhibit J and is incorporated by reference herein.

Fifth Am. Compl. (ECF No. 144) at ¶ 58; Defs.' Answer to the Fifth Am. Compl. (ECF No. 152) at 27.

HUD regulations, as referenced in the Lease Provision, require public housing authorities to provide and manage public housing that is decent, safe, sanitary, and in good repair. *See generally* 24 C.F.R. § 5.703 (setting forth standards for same). This includes habitability of all dwelling units in a building, and that all aspects of the same "must be free of health and safety hazards." 24 C.F.R. § 5.703(d)(1). The regulations state, "The housing must have no evidence of infestation by rats, mice, or other vermin," and, "The dwelling units and common areas must have proper ventilation and be free of mold, odor (e.g., propane, natural gas, methane gas), or other observable deficiencies." 24 C.F.R. § 5.703(f). Finally, HUD housing must continue to comply with state and local codes for building and maintenance. *See* 24 C.F.R. § 5.703(g).

*Bedbug Infestations Generally and HUD Best Practices*

Bedbugs (*Cimex lectularius*) are small, reddish-brown parasitic insects that bite the exposed skin of sleeping humans and animals to feed on their blood.[6] In recent years, bedbugs have experienced a global resurgence and are now found extensively across residential settings. They are known to cause a variety of negative physical health issues ranging from small bite marks to anaphylaxis (in rare cases), and sometimes secondary dermal infections such as impetigo, ecthyma, and lymphangitis. Most bites occur when a person is sleeping, which makes falling asleep harder and sleep less restful. As a result, bedbugs can also cause mental health problems such as anxiety and insomnia.

Bedbug infestations are notoriously difficult to remedy. Bedbugs are able to hide in extremely small places for a long time without feeding. They have also evolved to develop resistance to certain pesticides. They can travel over 100 feet in one night, but they tend to live within 8 feet of where people sleep, which causes obvious problems in the multifamily-home context. Therefore, federal agencies such as HUD, CDC, and EPA have promulgated guidance on how various stakeholders (local/state health agencies, property owners, residents, etc.) can tackle the problem of bedbugs, particularly in the multifamily home setting. The defendants have admitted that defendant WHA received several federal notices regarding best practices and effective methods of eradicating bedbug infestations in multifamily buildings, including but not limited to: *Joint Statement on Bed Bug Control* (promulgated in 2010 by the CDC and the EPA); a report entitled *What's Working for Bed Bug Control in Multifamily Housing* (a National Center

---

[6] The CDC and EPA issued a Joint Statement on Bed Bug Control in the U.S. in 2010, which was attached as Ex. C to the original complaint (ECF No. 1-1) at 5-9. In their answer, the defendants generally admitted the information contained in the Joint Statement. Much of the language from that Joint Statement is copied here.

for Healthy Housing study, funded and published in 2010 by the EPA); HUD Notice PIH-2011-22; an EPA Bed Bug Update (issued October 2011); HUD Notice H 2012-5; and HUD Notice PIH-2012-17.[7] Defs.' Answer to Fifth Amended Complaint (ECF No. 152) at 6-7. They deny, however, that all of these federal notices provided uniform guidance about best practices.

As the federal agencies note, there is no "silver bullet" for eradicating bedbugs in multifamily dwellings. Multiple recommended courses of action, however, exist to facilitate effective inspections and, if necessary, the eradication of, bedbugs. The CDC and EPA's 2010 *Joint Statement on Bed Bug Control in the United States* lays out a number of methods that housing authorities may employ as part of their comprehensive integrated pest management ("IPM") programs, such as: using monitoring devices, removing clutter where bed bugs can hide, applying heat treatment, vacuuming, sealing cracks and crevices to remove hiding places, using non-chemical pesticides (such as diatomaceous earth), and judicious use of effective chemical pesticides. Original Compl., Ex. C (ECF No. 1-1) at 8. The EPA's February 2010 *What's Working for Bed Bug Control in Multifamily Housing* report also recommends laundering and then isolating fabrics, encasing bedding, steaming furniture and linens, deploying bedbug-detecting canines, and freezing objects. *Id.* at 11-12. All of the federal agencies' notices that defendant WHA received are in agreement that proper communication and collaboration with residents is a key facet of any successful bedbug eradication plan. *See generally id.* All of the notices also recommend prompt intervention early on in infestations when bedbug populations are lower. HUD Notices PIH-2011-22 (April 2011), PIH-2012-17 (February 2012), and H 2012-5 (April 2012) specifically promote and encourage the use of IPM by public housing authorities ("PHAs") such as defendant WHA.

---

[7] The plaintiffs appended these federal notices to their original complaint at Ex. C. (ECF No. 1-1) at 5-37.

HUD Notice PIH-2011-22 specifically states, "Pest management is integral to the provision of safe and sanitary housing. In accordance with 24 CFR 903.7(e)(2), PHAs must include in their plans a description of any measures necessary for the prevention or eradication of pest infestations." *Id*. at 19. It goes on to outline the Fundamentals of IPM, which include several key actions that can help prevent and eradicate bedbug outbreaks in public housing buildings. Subsequent HUD notices state that a "PHA should respond with urgency to any tenant report of bedbugs." *E.g.*, *id.* at 36. HUD Notice PIH-2012-17 recommends that:

> The inspection should cover the unit reporting the infestation and no less than surrounding apartments consisting of the units above, below, left and right, and should be completed within three business days of the tenant complaint if possible. If reputable, licensed pest control companies are unattainable within three calendar days, the PHA is required to retain documentation of the efforts to obtain qualified services. If an infestation is suspected but cannot be verified using the methods described above, the PHA should re-inspect the unit(s) periodically over the next several months.

*Id*. at 37.

*The Bedbug Infestation at Poe Manor and the Defendants' Response*

As an initial matter, no one disputes that bedbugs have plagued Poe Manor for several years. The parties do, however, dispute when and how the defendants first became aware of, and began responding to, a bedbug infestation in the building. *See* Pls.' Resp. to DSMF ¶ 7. The plaintiffs rely on a January 2011 document purportedly summarizing WHA's bedbug expenditures on inspections by Smithereen Pest Management going back to 2010 to support their position that WHA was on notice of bedbugs at Poe Manor no later than January 2011. *Id*. The defendants maintain the statements in the document were made in error and the document lacks foundation. DSMF at ¶¶ 6-9. After attempting to dispute the authenticity and accuracy of this document, the defendants have conceded, for the purposes of this motion only, that there is a genuine dispute as to when WHA was put on notice of the bedbug infestation based on whether the

inspections/expenditures reflected in the document relate to bedbugs or a different pest, such as cockroaches. *See* Defs.' Reply (ECF No. 251) at 2. They claim these facts are not material because the plaintiffs' claims fail regardless of when the defendants actually became aware of the bedbug problem at Poe Manor.

It is undisputed, however, that the defendants conducted (or at least attempted) some remedial efforts in November and December of 2011. A tenant named Troy Thompson informed building management that he thought he had bedbugs in October or November 2011. DSMF ¶ 6. The defendants hired Smithereen, a third-party extermination company, to inspect some units and ultimately engage in three bedbug treatments in November and December of 2011, two of which were in the same unit. PSMF ¶ 12; DSMF ¶ 97. Although Smithereen recommended using an inspection strategy known as the "cloverleaf" method, whereby they would inspect all units surrounding a unit with confirmed bedbugs, the WHA opted not to use that method systematically. The evidence does show, however, that the WHA did not elect to opt out of cloverleaf inspections in their contract and may have paid extra to have such inspections as an option. DSMF ¶¶ 100, 106. It is not entirely clear from the record if, and how many times, the WHA actually used this method. Rather, Smithereen primarily inspected units in response to individual complaints, rather than more proactive solutions such as the cloverleaf method. DSMF ¶ 100. Where Smithereen inspections confirmed the presence of bedbugs in Poe Manor units, Smithereen used conventional chemical bedbug treatments. DSMF ¶ 101. In 2011, the WHA spent $508 on these three treatments and associated inspections. PSMF ¶ 1.

Eradication efforts continued for the next several years. In mid-2012, the WHA enlisted the help of a new pest control company, Orkin. Ex. 6 to DSMF (ECF No. 228-6).[8] In 2012, approximately 47 treatments took place, and the WHA spent $8,412 on their eradication efforts in 2012. PSMF ¶¶ 1, 12. These inspection and eradication efforts escalated in mid-to-late 2013 and increasing even more in 2014. The WHA spent $21,379 on these efforts in 2013; $29,422.50 in 2014; $23,882 in 2015; $3,945 in 2016; and $15,695 in 2017 as of June 21. PSMF ¶ 1. Altogether, this amounted to a total of $143,379.50 on professional bedbug inspections, treatments, and tenant-education activities. DSMF ¶ 23. The plaintiffs' expert, Michael Potter, attested that Orkin, at the direction of the WHA, conducted at least three annual building-wide canine inspections from 2013-2015. Affidavit of Michael Potter (ECF No. 161-1) at 3. He further attested, "Between 2011 and 2017, nearly every unit in the building (95%) had been treated at some point for bed bugs." *Id*. at 1; DSMF ¶ 266. Nevertheless, the parties dispute nearly every aspect of the inspection and treatment history, including the extent to which the defendants inspected and treated common areas in the building, whether they occasionally refused to inspect or treat for bedbugs in response to tenant complaints, the extent to which the defendants provided sufficient resources to tenants (*e.g.*, mattress encasements and replacement furniture), and whether tenants were uncooperative in taking steps to make their units less prone to bedbug infestations.

The parties also dispute the overall effectiveness of the defendants' eradication efforts. The defendants have provided several statistics to demonstrate that monthly infestation rates were generally low, with the exception of a few flare-ups. DSMF ¶ 21 ("[T]he average rate of infestation in Poe Manor on a month- to-month basis was 6.122% and, at its worst in September of 2013, it

---

[8] There appears to have been some limited overlap between the two companies during this time, but the WHA eventually switched entirely to Orkin.

was at 40%."). The plaintiffs dispute the validity of the data and methods behind the defendants' calculations. Pls.' Resp. to DSMF at ¶¶ 18-22. They argue that the lack of building-wide inspections on a monthly basis renders the month-to-month rates misleading, and under-reporting of bedbugs by tenants means the real rates were much higher. *Id* at ¶ 19 ("The annual, minimum infestation rates at Poe Manor were 2011 (22%), 2012 (17.4%), 2013 (40%), 2014 (49.7%), 2015 (26.5%), 2016 (19.4%) and 2017 (34.2%).").

Finally, it seems that the bedbug infestation at Poe Manor had not been eradicated by the end of the discovery period. DSMF ¶ 15

*Communication with Tenants About the Infestation*

The defendants undertook various efforts to educate Poe Manor tenants about identifying, detecting, and reporting bedbugs throughout the class period, including by hanging informational posters, holding meetings, and handing out pamphlets to new tenants. DSMF ¶¶ 226, 250 (tenants recalled seeing "colorful and informative bedbug posters in the elevator at Poe Manor;" the posters explained what bedbugs look like and how to detect them); ¶¶ 227, 249 (tenants received written notices regarding upcoming meetings during which bedbugs would be discussed); ¶ 13 (property manager oriented new tenants using informational pamphlets).

Although the plaintiffs for the most part don't dispute the occurrence of these educational efforts, they point to evidence that the defendants actually concealed information about the infestation and even discouraged tenant communications about the bedbug situation on multiple occasions. Defendant Daniel testified that she participated in the orientation of new tenants with regard to bedbugs generally. Ex. 5 to DSMF (ECF No. 228-5) at 26:2-4. She testified that she did not, however, alert new tenants that there were recurring (or possibly ongoing) bedbug infestations in the building unless they specifically inquired. *Id*. at 26:12-27:7. In fact, some tenants who had

heard a rumor about bedbugs in Poe Manor and asked Daniel about it were told there were no bedbugs.[9] PSMF ¶ 6. Another witness stated that when she told the other property manager, defendant Cornelious, "You have an epidemic on your hands right now," he responded, "Well, I haven't heard anything about bed bugs. I don't know anything about it." Pls.' Resp. to DSMF ¶ 171; Ex. 25 to DSMF (ECF No. 228-57) at 32:19-33:2. Further, some witnesses testified that Cornelious at various times discouraged tenants from discussing the bedbug situation, and that on one occasion Cornelious became annoyed by complaints about bedbugs and threatened to make a tenant pay out of pocket for treatment of their unit. DSMF ¶ 152; PSMF ¶ 17. Meanwhile, other witnesses who had lived at Poe Manor for the entirety of the class period stated they had no personal knowledge of any deliberate suppression of communications about bedbugs. DSMF ¶ 169.

*Poe Manor Tenants' Injuries*

The plaintiffs claim, and the defendants have not disputed for purposes of this motion, that numerous Poe Manor tenants were, at times, unable to sleep soundly in their apartments due to the presence and fear of bedbugs. PSMF ¶ 9. Further, the infestation impacted their living arrangements and lifestyles; many tenants were forced to move out, face homelessness, refrain from entertaining guests or visit family & friends, and avoid going elsewhere for fear of passing bedbugs. PSMF ¶ 16. The infestation further impacted tenants by forcing them to throw out their furniture, clothing, and other personal items, and some resorted to sleeping on air mattresses or the floor. PSMF ¶ 18.

---

[9] The defendants dispute this point, stating Daniel provided instructional pamphlets about bedbugs to all new tenants; however, both these things can be true: Daniel could have provided tenants with information about bedbugs generally while still denying that they were present in Poe Manor at the time.

## ANALYSIS

Summary judgment is appropriate only when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding the defendants' motion for summary judgment, the Court must construe all facts and reasonable inferences in favor of the plaintiffs, who are the nonmoving parties. *Love v. JP Cullen & Sons, Inc*., 779 F.3d 697, 701 (7th Cir. 2015). If the defendants have demonstrated the absence of a disputed material fact, then the burden shifts to the plaintiffs to "provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch,* 698 F.3d 561, 564 (7th Cir. 2012).

## I.     Section 1983: Substantive Due Process

To prevail on their § 1983 claim, the plaintiffs must establish that the defendants, while acting under the color of state law, deprived them and their fellow class members of a right, privilege, or immunity secured by the Constitution or the laws of the United States. *London v. RBS Citizens, N.A.*, 600 F.3d 742, 745-46 (7th Cir. 2010*)*. The Court previously found that the plaintiffs had stated a plausible § 1983 claim against the defendants for violating their substantive due process rights under the state-created danger doctrine. *See generally* 9/30/2016 Order (ECF No. 33). The defendants now claim that the plaintiffs have failed to adduce evidence sufficient to support their state-created danger theory at trial, and, even if they could, the supposed constitutional violation was not clearly established. The Court finds that the plaintiffs are correct at both junctures.

### A.     Violation of Substantive Due Process Rights

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." The Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of

law,' but [does not] impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). For example, in *Windle v. City of Marion*, 321 F.3d 658, 661-62 (7th Cir. 2003), the Seventh Circuit found no constitutional violation where a police officer failed to intervene to protect a student despite knowledge that she was being sexually molested by a middle school teacher. This is because the Due Process Clause does not confer upon the student a right to the officer's affirmative help in the face of danger imposed by a private party acting independently of the officer. *Id.* One exception to this general rule applies in cases where the state, "by exercising custody over a person[,] deprive[s] him of the ability to protect himself from private harms and has thus endangered him." *Slade v. Bd. of Sch. Directors of City of Milwaukee*, 702 F.3d 1027 (7th Cir. 2012) (compiling cases). In such cases, which typically involve incarcerated persons or involuntarily committed mental patients, "the state would be a doer of harm rather than merely an inept rescuer," when it fails to protect in its custodial capacity. *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990) (holding that a child in state custody has a liberty interest in not being placed in an abusive foster home). This exception does not apply here. The plaintiffs were never in custody, nor does their public housing situation give rise to the kind of "special relationship" between them and the state that the Seventh Circuit has recognized falls within the bounds of this exception.

Another exception, which the plaintiffs here have invoked, is the state-created danger doctrine. Not so much an "exception" as it is the flipside of the coin, this doctrine applies where "state action . . . creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger tha[n] they otherwise would have been." *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993). To prevail under this doctrine, the plaintiff must prove three elements:

13

(1) "the state, by its affirmative acts, . . . create[d] or increase[d] a danger faced by an individual,"
(2) "the failure on the part of the state to protect an individual from such a danger . . . [was] the
proximate cause of the injury to the individual," and (3) "the state's failure to protect the
individual . . . shock[s] the conscience." *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d
812, 818 (7th Cir. 2007). The defendants argue that the plaintiffs have failed to adduce sufficient
evidence to support elements (1) and (3) of their claim.

1.    Affirmative Act that Increased the Danger to Poe Manor Tenants

The Court previously found that it was possible that a fully developed record would show
that the defendants' actions increased the dangers posed by the bedbug infestation. *See* 9/30/2016
Order (ECF No. 33) at 5 ("This Court is therefore not prepared to find, at the motion to dismiss
stage, that a fully developed factual record could not show that the defendants in this case took
reckless actions that created or exacerbated a danger for the plaintiffs, causing them injury."); 
4/22/2019 Order (ECF No. 186) at 18. "When courts speak of the state's 'increasing' the danger
of private violence, they mean the state did something that turned a potential danger into an actual
one, rather than that it just stood by and did nothing to prevent private violence." *Sandage v. Bd.
of Com'rs of Vanderburgh Cty.*, 548 F.3d 595, 600 (7th Cir. 2008). The plaintiffs, however, have
not identified any affirmative acts by the defendants that increased the danger of bedbugs to Poe
Manor tenants in the record. They have thus failed to satisfy this aspect of their state-created danger
claim.

According to the plaintiffs, the defendants supposedly engaged in the following affirmative
acts that increased and/or exacerbated the danger to the tenants:

- "Defendants' ten-month delay in responding to the infestation after learning that a significant number of units (34 of 155) had live activity…" Pls.' Resp. (ECF No. 241) at 22.

- "[I]nstead of increasing inspections and engaging in other approaches, Defendants unaccountably stopped annual inspections altogether in 2016 and 2017." *Id*.

- "They stopped posting bedbug informational posters … lessening the likelihood tenants would be educated enough to bring bedbug sightings to Defendants' attention, which was critical to their ill-advised complaint-based approach." *Id*.

- "Defendants were repeatedly and consistently put on notice that the living conditions at Poe Manor fell far short of their obligations. They knew or reasonably should have known that their approach to the bedbug infestation was not working, as evidenced by the fact of its increase and spread, and as evidenced by the consistent and ongoing tenant complaints." *Id*. at 22-23.

If the term "affirmative act" as used in the context of this doctrine is to retain any significance, the plaintiffs' offerings cannot suffice. *See Sandage*, 548 F.3d at 599 ("To 'create or increase' must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect. If all that were required was a causal relation between inaction and harm, the rule of *DeShaney* would be undone." (citations omitted)). First, all of what the plaintiffs claim are affirmative acts by the defendants amount to either inaction or actions that did not reduce the danger enough. The plaintiffs do not dispute that the defendants took ***some*** actions aimed at mitigating the infestations, and although they claim those actions were insufficient, it is impossible to infer from the record that the plaintiffs ***ended up worse off because of the defendants' efforts*** than if the defendants had done nothing at all to respond to the infestation. It

15

would be a different story if the plaintiffs had presented evidence that, for instance, the defendants were so incompetent that their eradication efforts actually increased the breadth and/or severity of the bedbug infestation throughout Poe Manor—that is, more broad and more severe than if they had completely ignored it and let the bedbug infestation grow unabated. But the plaintiffs have presented no such evidence.

The plaintiffs cite multiple cases to support their position that the defendants' conduct here can be characterized as affirmative acts increasing the tenants' exposure to harm. In *Paine v. Cason*, 678 F.3d 500, 509-510 (7th Cir. 2012), the Seventh Circuit affirmed the denial of summary judgment to officers who arrested a bipolar individual at an airport and then released her defenseless at night in a dangerous neighborhood where she was subsequently beaten and raped. It is not clear how this case supports the plaintiffs' position. For one, it is clear that in that case the officers affirmatively propelled the victim into the dangerous position. The plaintiffs cite the court's language about what the officers didn't do (*e.g.*, they didn't warn her about the neighborhood, return her cellphone, walk her to the nearest station, etc., *id*. at 510), but those facts all relate to how the officers could have mitigated the dangerousness of the situation they affirmatively put her in after they picked her up and dropped her off somewhere completely different and more dangerous. This case cuts against the plaintiffs' argument.

Next, the plaintiffs cite *Eilenfeldt v. United C.U.S.D. #304 Bd. of Ed.*, 84 F. Supp. 3d 834 (C.D. Ill. 2015). In *Eilenfeldt*, the court denied a school district and certain school officials' motion to dismiss a state-created danger claim where the school and its administrators failed to respond to the student-victim's complaints about ongoing bullying, harassment, and threats of violence from other students. *Id*. at 838-39. The plaintiffs cite this case to support their position that inaction by state actors can give rise to a substantive due process violation under the state-created danger

16

doctrine;[10] however, the court in that case clearly stated, "A government failure to act is 'actionable' [under substantive due process] if a special relationship has been created between the government and the victim, or if the state created the danger that now threatens the victim." *Id*. at 845. The state must have done ***something*** at some point to increase the danger, either by being the source of the danger itself or by putting the victim in a diminished capacity to defend himself from it—which is still another way of saying the state must not affirmatively act to increase the risk of danger. *Id*. In *Eilenfeldt*, the plaintiff was not proceeding on a special relationship theory, *id*. at n.4, but rather had presented the court with evidence that the state actors had, in some instances, affirmatively supported the bullying and harassment. *See id.* at 838-39 ("To the contrary, administrators and teachers facilitated ongoing bullying of J.M. by failing to stop the bullying, ***actively encouraging bullying, and punishing J.M. for defending himself while being bullied***." (emphasis added)). The plaintiff in that case was thus able to point to several facts showing the school officials, by their affirmative actions, had diminished the victim's ability to defend himself and thereby placed the victim in harm's way, even if they were not the ones who directly inflicted the danger upon him. Here, the plaintiffs have pointed to no evidence that the defendants affirmatively placed Poe Manor tenants in harm's way; they did not introduce the bedbugs to Poe Manor, nor did they do anything to increase the risk to a higher level than what it would have been had they done nothing at all.

The plaintiffs also cite *Slade v. Board of School Directors of City of Milwaukee*, 702 F.3d 1027 (7th Cir. 2012) in another attempt to circumvent the "affirmative act" requirement. In that case, a middle-school student joined a school outing to a nearby lake, for which the school obtained

---

[10] The plaintiffs specifically quote the court in *Eilenfeldt* when it held, "placing someone in a position of diminished ability to care for himself … creates a threat to a victim, in light of which the state's failure to act is constitutionally deficient." *Id*. at 845.

parental permission to let the kids play in the water with no lifeguard present—contrary to district policy. *Id*. at 1209. The student drowned after going chest-deep into the lake despite being told not to do so by a supervisor. *Id*. Judge Posner, writing for the Seventh Circuit, opined that "[t]he term 'affirmative act' … is unhelpful. All acts are affirmative, including standing still when one could save a person by warning him of some impending danger." *Id*. at 1030. As the defendants correctly note, however, "the Seventh Circuit has since clarified the application of the 'affirmative act' element." Defs.' Reply (ECF No. 251) at 8 (citing *Doe v. Village of Arlington Heights*, 782 F.3d 911, 918 (7th Cir. 2015)). The Court in *Doe* reiterated that aspect of the doctrine when it stated, "When courts speak of the state's 'increasing' the danger of private violence, they mean the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Doe*, 782 F.3d at 917 (quoting *Sandage*, 548 F.3d at 600). If one of the teachers in *Slade* had, for example, made a poor attempt at rescuing the drowning child, that could not have been held against them as affirmative acts increasing the danger. Here, too, the defendants' remedial measures, no matter how ineffective, cannot be said to constitute affirmative acts in the manner contemplated by the case law.

*Slade* is of dubious benefit to the plaintiffs in any event, as in that case the Seventh Circuit rejected the substantive due process claim and did so despite evidence of actions taken by the *Slade* defendants that were more "affirmative" than any of the actions the plaintiffs identify here. *Id*. at 1030 ("The defendants acted when they decided to have an outing for the students at which there would be swimming, when they asked parental authorization, when they allowed the kids to go into the water even though no lifeguard was present."). Judge Posner further explained why a constitutional violation cannot be found in most circumstances where the state's incompetence (*i.e.*, negligence or gross negligence) in providing a public service leads to harm:

> [A] constitutional right to adequate police protection and other public assistance would place federal judges in control of much of the apparatus of government. For much of what government does is protect and otherwise assist members of the public, and when it fails in these duties and harm results it is often easy enough to make a colorable claim of negligence or worse. Were liability under federal law allowed to be imposed in such cases, federal judges would become deeply involved in the allocation of public funds and services, a task for which guidance can't be found in the Constitution.

*Id*. at 1027. The Seventh Circuit ultimately held that the state-created danger claim failed because the state actors were negligent but not reckless. *Id*. at 1033. As discussed next, the plaintiffs' substantive due process theory falls short on this basis as well.

2.    Failure to Protect that Shocks the Conscience

"The 'shocks the conscience' element of a state-created danger claim 'is a reminder that liability for a constitutional tort requires proof that the defendant acted (or failed to act) not merely negligently but recklessly (equivalently, with deliberate indifference to the risk of harm that he was creating).'" *Vaughn v. City of Chicago*, 2014 WL 3865838, *3 (N.D. Ill. Aug. 5, 2014) (quoting *Sandage*, 548 F.3d at 599). This is because "[t]he government need not provide services, and … if it does provide services it need not provide them competently." *Archie v. City of Racine*, 847 F.2d 1211, 1215 (7th Cir. 1988). Rather, what matters for a substantive due process violation is the state's intent when inflicting (or augmenting) harm upon the individual, and recklessness, but not gross negligence, can serve as a proxy for intent. *Id*. at 1220. What does it mean, then, for the state to have been reckless? "The cases generally understand 'recklessness' to mean knowledge of a serious risk to another person, coupled with failure to avert the risk though it could easily have been averted." *Slade*, 702 F.3d at 1029.

The record, viewed as a whole and in the light most favorable to the plaintiffs, may be able to support a claim of negligence or gross negligence on the part of the defendants, but not reckless

indifference. Therefore, even if the plaintiffs had adduced evidence to show an affirmative act by the defendants that caused or increased the risk of harm to the plaintiffs, their state-created danger claim would nonetheless fail. A truly constitutionally deficient, recklessly indifferent response would not have involved enlisting multiple professional pest management companies, spending around $140,000 on pest control and tenant education treating over seven years, conducting at least a few building-wide inspections in addition to numerous other complaint-based inspections, treating around 95% of the units in the building using pesticides or other similar means, and organizing bedbug awareness seminars, among other things. A reasonable factfinder could not find that, in light of these efforts, the defendants acted recklessly—*i.e.*, with conscious disregard of the known risks. They did not disregard those risks; they (at worst) just failed to use the appropriate amount of care while attempting to address them.

To be sure, the plaintiffs offer ample evidence that could lead to a finding that these measures were "short-sighted, flawed, negligent, and tortious." *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 656 (7th Cir. 2011). There is evidence that their conduct fell well short of best practices, which typically involve far more intensive monitoring and inspection practices, transparent communication and cooperation with residents, and more aggressive responses in the early days of the infestation.[11] But those levels of culpability do not "satisfy the standard for finding a constitutional violation." *Id*. "Only 'the most egregious official conduct' will satisfy this stringent inquiry. Making a bad decision, or even acting negligently, does not suffice to establish

---

[11] The defendants' ten-month delay between January 2011 when a document purportedly shows some bedbug inspections and when they began further inspections and treatments with Smithereen is disputed. Viewing this fact in favor of the plaintiffs, it is not clear what the status of the bedbug infestation was during that period. The plaintiffs have not pointed to evidence suggesting that additional inspections or treatments beyond whatever the WHA paid for, as reflected in that document, were necessary at that time.

the type of conscience-shocking behavior that results in a constitutional violation." *Id*. at 654-55

(quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

Other than ineffective inspection and treatment methods, the plaintiffs point to evidence

that the defendants occasionally lied to tenants about the existence of bedbugs in Poe Manor and

suppressed tenant communications about the issue. Nevertheless, they do not dispute that, overall,

the defendants did engage in a general awareness campaign by hanging posters,[12] holding

educational seminars for tenants led by Orkin, and handing out informational pamphlets.[13]

Individual instances of disinformation, even if true, do not sufficiently undermine the general

building-wide educational efforts the defendants indisputably undertook at various points during

the class period. These instances do not carry the plaintiffs' argument across the line into

conscience-shocking territory.

Finally, the nature of the potential harm involved in this case is not such that it is relevant

in assessing whether the defendants acted recklessly. The plaintiffs have, to be sure, adduced

sufficient evidence to demonstrate that the harm done to the tenants by the bedbugs was quite

serious. The prolonged bedbug infestation unraveled the lives of numerous Poe Manor tenants,

many of whom are among the most disadvantaged members of the Waukegan community. While

---

[12] The plaintiffs dispute the existence of these posters by citing to one WHA employee's testimony he did not see them during his year-long tenure—from May 2016 to June 2017—as property manager. Pls.' Resp. to DSMF at ¶ 31. The plaintiffs' point is well taken as to this time period, but the plaintiffs have not pointed to any evidence creating a conflict with the abundant evidence, including testimony from class members, that there were informational bedbug posters hanging at multiple other points during the class period.

[13] The plaintiffs similarly dispute whether tenants received pamphlets because "a review of the 37 tenant files received by plaintiff reveals no proof thereof." Pls.' Resp. to DSMF at ¶ 31. The absence of these pamphlets in tenant files is not proof of their non-existence, and the Court will not make the unreasonable inference that WHA employees such as Daniel did not hand them out on this basis when there is testimony from multiple witnesses that she and/or other WHA employees did so. Ex. 18 to DSMF (ECF No. 228-42) at 23:10-23; Ex. 5 to DSMF (ECF No. 228-5) at 26:5-11; Ex. 36 to DSMF (ECF No. 228-68) at 15:19-10.

deeply unfortunate, the extent of the injury does little to move the needle here on whether the defendants acted recklessly. Recall the facts in *Slade*: a twelve-year-old boy drowned on a school outing, but that did not change the fact that it was "the defendants' ***negligence*** [that] enhanced the risk to [the boy], but negligence is not enticement, or deliberate indifference, or blindness to obvious dangers." *Slade*, 702 F.3d at 1032 (emphasis added).

### B.    Clearly Established

"[G]overnmental actors performing discretionary functions enjoy qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010) (cleaned up). To withstand summary judgment on their § 1983 claim, the plaintiffs bear the burden of establishing that the constitutional right was "clearly established" at the time of the alleged violation. *Id.* at 779. The plaintiffs can satisfy this test by "presenting a closely analogous case that establishes that the Defendants' conduct was unconstitutional or by presenting evidence that the Defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Id.* at 780. Here, even if the plaintiffs were able to demonstrate a violation of their substantive due process rights, they have not met their burden of showing the right was clearly established.

As illustrated by the parties' briefing on this issue, these cases typically involve the difficult inquiry of "identifying the level of generality at which the constitutional right must be clearly established." *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). The defendants characterize the right at issue as the failure to follow best practices to eliminate a pest infestation in a public housing facility. The plaintiffs, on the other hand, try to frame the right at issue as "a legal interest in due process as public housing tenants," and they support it by citing to cases where courts found

constitutional violations in the context of pest infestations in prisons. Neither reach the Goldilocks—"just the right amount"—level of generality required. The Seventh Circuit has held that "the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted." *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987). In other words, were the contours of the right "sufficiently clear that a reasonable official would understand that what he is doing violates that right[?]" *Estate of Escobedo*, 600 F.3d at 779 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). The Court finds that they were not.

The defendants' characterization of the alleged constitutional violation—the failure to follow best practices to eliminate a pest infestation in a public housing facility—is slightly off. The plaintiffs are right that their claim does not rest entirely on the failure to follow best practices; the defendants could have deviated from best practices here while still achieving a satisfactory result in their eradication efforts (no matter whether that would have been ill-advised). And it is possible that in many cases relating to pest control there may not be uniform, or perhaps any, best practices for state officials to follow. Those best practices may be overkill in some situations. A reasonable official's knowledge of the legality of their conduct in responding to a pest infestation should not depend entirely on such ever-evolving, sometimes contradictory, and extra-constitutional standards. In sum, the incorporation of "best practices" into the characterization of the constitutional right renders it ineffective at providing state officials with sufficient notice about the legality of their conduct.

The plaintiffs, on the other hand, cite *Slavish v. City of Wilkes-Barre*, No. 3:17-CV-1468, 2018 WL 5289500, at *6 n.3 (M.D. Pa. June 14, 2018) for the proposition that:

> [T]he right at issue is not merely whether the plaintiffs' have a legal entitlement to "decent, safe and sanitary housing," but whether they had ***a clearly established legal interest in due process as public***

> *housing tenants* – something that the Housing Act expressly
> provides for and, indeed, requires of public housing authorities.

(emphasis added). But the constitutional right at issue here cannot be as broad as "a legal interest in due process as public housing tenants," or else officials would have little guidance on how they are required to respond to the bevy of circumstances and crises with which they are faced when managing public housing buildings. "[A] high level of generality won't do." *Weiland v. Loomis*, 938 F.3d 917, 919 (7th Cir. 2019). And in any event, the district court in *Slavish* was addressing the applicability of qualified immunity to the plaintiffs' procedural due process claim based on the Housing Act's tenant-grievance procedures when conducting the above analysis. *Slavish*, 2018 WL 5289500 at *6 & n.3. It was not addressing the state-created danger doctrine in making the pronouncement that the plaintiffs cite.

Rather, the plaintiffs must have shown that the case law or Constitution clearly established the following: A public housing authority or its representatives cannot commit a reckless act that by gratuitously endangering a public housing tenant results in an injury to that tenant.[14] *See Slade*, 702 F.3d at 1033. The plaintiffs have not satisfied their burden of showing that this right has been clearly established. The defendants' argument that the plaintiffs' "reliance on conditions-of-confinement cases under the Eighth Amendment is misplaced," Defs.' Reply at 20, is well taken. The Supreme Court has stated, "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The plaintiffs' Eighth Amendment conditions-of-confinement prison cases

---

[14] The Court stated as much when it held in its 9/30/16 order on the motion to dismiss that:

This case law suggests that while the government may not be required to provide public housing, if it does so, it cannot endanger residents by recklessly (or intentionally) creating or failing to remedy defects that cause the residents of that housing significant injuries.

ECF No. 33 at 5.

24

never put the constitutional question here beyond debate. Prison officials and public housing officials are subject to markedly different constitutional requirements. For one, public housing officials need not keep themselves apprised of the developments in Eighth Amendment conditions-of-confinement law, such as the cases the plaintiffs cite. Moreover, the factual circumstances of the prison cases are too dissimilar from the present circumstances to give the defendants sufficient warning regarding the constitutionality of their conduct. For one, inmates and public housing tenants have vastly different restrictions on their freedom of movement—a primary reason why the "special relationship" exception to substantive due process applies to prisoners and not public housing tenants—and self-help measures available in pest infestations.

The plaintiffs do not point to any cases in the public housing context where a pest infestation or other similar defect led to a substantive due process violation. As the defendants point out, the non-prisoner cases the plaintiffs cite in their brief to demonstrate the clear establishment of the rule actually weigh against such a finding. In *Slavish*, after denying qualified immunity on the procedural due process claim in a public-housing-bedbug case like this one, the court actually dismissed the state-created danger claim for failure to plead an affirmative act or conscience-shocking conduct. *Slavish*, 2018 WL 5289500 at *7-9. The same is true for the other case, *Barber v. Rome Housing Authority*, 2018 WL 1621533 at *4-7 (N.D.N.Y. Mar. 30, 2018). Given the lack of any authority clearly establishing the violative nature of the defendants' conduct, the plaintiffs have failed to meet their burden in defeating the application of qualified immunity. As a result, even if the Court were to find a genuine dispute of material fact as to the existence of a state-created danger, qualified immunity still applies, and summary judgment on this claim is appropriate.

## II.     Breach of Contract

The plaintiffs claim the defendants breached the Lease Provision, "Section 9: Management's Obligations" of the lease. They claim the Lease Provision required the defendants "to maintain the Premises and the development in a decent, safe and sanitary condition, [and] to comply with the requirements of applicable building and housing codes and regulations of [HUD] materially affecting health and safety. . . ." Sixth Am. Compl. (ECF No. 244) at ¶¶ 53-55.[15] A claim under Illinois law for breach of contract requires the plaintiff to establish the following prima facie elements: (1) the existence of a contract, (2) its own performance of the contract's conditions, (3) a breach by the defendant, and (4) damages resulting from the breach. *Performance Food Group Co., LLC v. ARBA Care Ctr. of Bloomington*, 2017 IL App (3d) 160348, ¶ 19. The parties dispute whether the plaintiffs have adduced evidence sufficient to support a jury verdict in their favor as to elements (1) and (3). For the following reasons, the Court finds that enforceable leases existed, and the plaintiffs have adduced evidence sufficient to lead a reasonable factfinder to find that the defendants breached those leases on a class-wide basis.

### A.     The Existence of a Contract and its Relevant Terms

The defendants, citing Illinois law, first argue that the lack of a complete and authenticated copy of the lease in the record necessarily precludes the plaintiffs from establishing the existence

---

[15] The plaintiffs also claim that the defendants failed to follow the provision of the Resident Handbook for Poe Manor requiring that a "Notice of Completed Treatment" be left in a unit after that unit has been treated by an exterminator. Sixth Am. Compl. (ECF No. 244) at ¶ 54. Defendants point out two flaws: (1) a complete copy of the Resident Handbook was never produced or authenticated, and (2) the excerpt of the Handbook (attached as Ex. K to the original complaint, ECF No. 1-2) states that the Notice is something that "the exterminator leaves after the work is done." The plaintiffs do not respond to the defendants' arguments or point to anything in the record to support their position on this alleged breach. Indeed, they have not established that the Resident Handbook is a legally binding instrument. Accordingly, the Court accepts the defendants' arguments on this breach, disposes of this particular claim, and focuses on the alleged breach of the residential leases.

and terms of the leases with all class members. This is because "a court deciding a breach of contract claim must construe the terms at issue in light of the contract as a whole, and 'the parties' intent cannot be determined by viewing a specific provision in isolation or by looking at detached portions of the contract.'" Defs.' Reply (ECF No. 251) at 21 (quoting *Stonegate Props. v. Piccolo*, 2016 IL App (1st) 150182, ¶ 41). The defendants support their position by citing to Illinois pleading standards, which "generally require a litigant raising a dispute about a written instrument to attach a complete copy of that written instrument to the complaint." *Id.* (citing *CNA Int'l Inc. v. Bear*, 2012 IL App (1st) 112174, ¶ 47 ("A plaintiff who alleges breach of contract is statutorily required to attach the contract at issue to its complaint.")). This pleading standard, according to the defendants, illustrates the centrality of a comprehensive review of a contract's terms when considering a dispute about that contract under Illinois law.[16]

The absence of a complete and authenticated copy of the lease is not fatal to the plaintiffs' breach of contract claim. First, the defendants "do not deny the existence of written leases with each Class Member." Defs.' Memo at 15. Second, there is sufficient evidence that those leases contained the Lease Provision, and that the provision generated the listed obligations surrounding health and safety. In support, the plaintiffs point to the defendants' admissions that (1) the defendants' lease form for Poe Manor provides for the management obligations surrounding health and safety described in the provision above and excerpted in Ex. J to the original complaint, Defs.' Answer to the Fifth Am. Compl. (ECF No. 152) at 27; and (2) the Waukegan Housing Authority

---

[16] The Court does not interpret the defendants' argument to be that the claim fails, as a procedural matter, due to the plaintiffs' failure to attach a complete copy of the lease to the complaint. That pleading standard does not apply in federal court. *See, e.g.*, *Mount Hawley Ins. Co. v. Guardsmark, Inc.*, No. 01C5088, 2001 WL 766874, at *1 (N.D. Ill. July 5, 2001). Rather, the Court understands this argument to suggest that this procedural state law requirement has the substantive implications regarding contract interpretation discussed above.

at Poe uses a standard HUD lease with tenants, DSMF Ex. 5 (ECF No. 228-5) at 17:9-13. The Court agrees. Collectively, these admissions permit a reasonable inference that the leases between the defendants and class members created the legal obligations at issue.

As for the other terms of the contract, the absence of a complete copy of the lease would be an issue if the terms or enforceability of the Lease Provision were ambiguous. In such a case, the plaintiffs would not be able to establish the terms of the contract and accordingly could not establish a breach. The Lease Provision in the record, however, plainly sets forth the defendants' obligations with regard to health and safety. The only potential ambiguity in the Lease Provision that the defendants point to is the definition of the term "Premises." The capitalization of the word indicates it is a defined term, but the portion of the lease defining it is not part of the record. But it would be too great of a stretch to say, as the defendants do, that it's "impossible to know how the lease defines the term, 'Premises.'" Defs.' Memo at 16. The Court is unpersuaded that the term "Premises" could refer to anything other than the premises that were the subject of the lease—*i.e.*, the tenant's individual unit. The defendants do not offer any other alternative interpretations. Moreover, the Lease Provision refers to multiple other areas of the Poe Manor property (*e.g.*, "the development," "development buildings," "facilities," and "common areas"), leaving the only reasonable interpretation of the word "Premises" to be the tenants' dwellings.

### B. The Defendants' Compliance with the Lease Terms

The defendants next argue that, even if the Lease Provision did generate enforceable health and safety obligations, the plaintiffs have not adduced enough evidence to show that the defendants failed to comply with those obligations. They make two points in this regard. First, any time "the WHA was put on notice of a pest issue in one of the units, they procured the services of a professional pest control company and attempted to remediate the issue at no cost to the tenant." Defs.' Memo at 16. Second, "the evidence indicates that the average rate of infestation in Poe

Manor at all relevant times was 6.122% of units, which establishes that the WHA did keep the 'Premises' in a clean, safe, and sanitary condition." *Id*. They argue these facts establish, at minimum, substantial compliance with the Lease Provision.

But the defendants fail to meet their summary judgment burden of establishing a lack of dispute as to either of those facts. The plaintiffs have disputed both of these points. First, they dispute the accuracy of the defendants' cited monthly reporting percentages based on (1) the fact that building-wide inspections were not conducted on a monthly basis and (2) the tendency of tenants to underreport bedbugs. Therefore, a reasonable factfinder could conclude that the monthly infestation rates were not as low as the plaintiffs make them out to be and/or that the monthly infestation rates are not helpful proxies for substantial compliance with the lease terms. Second, the plaintiffs have established that the defendants failed to respond to tenant complaints on multiple occasions. More generally, they have adduced evidence suggesting that the defendants' efforts were in many cases ill-advised and ineffective at eradicating the infestation. The record also provides the basis for the inference that the defendants knew about, but deliberately elected not to follow, significant aspects of HUD and other federal agencies' suggested best practices. Although a breach does not necessarily follow from a failure to follow best practices, that failure could help lead a reasonable factfinder to conclude that the severe and protracted nature of the infestation was not inevitable or that eradication was impossible; had the defendants employed more advisable measures, they could have made Poe Manor a safer and more sanitary place, as the lease required. In sum, there is sufficient evidence to support a finding that the defendants breached their duty under the lease to maintain the leased units in a safe and sanitary condition.

## III. Unjust Enrichment

"Although we are at the summary judgment stage, the Court still looks at the complaint to determine Plaintiff's claims." *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 270

(N.D. Ill. 2020) (citing *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir. 1992)). With respect to the unjust enrichment claim, the plaintiffs' Sixth Amended Complaint (ECF No. 244) alleges at ¶ 51: "Defendants' failure, since January 2011, to maintain Poe Manor in a habitable condition by responsibly eradicating a severe bedbug infestation, while continuing to collect full rent from Residents, constitutes unjust enrichment under Illinois law."

Because the Court has determined that an enforceable contract exists between the parties, and because the unjust enrichment claim is premised on the same obligations and conduct of the parties as the breach of contract claim, summary judgment is entered in favor of the defendants on the unjust enrichment claim. *See Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688-89 (7th Cir. 2004) ("When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract. In determining whether a claim falls outside a contract, the subject matter of the contract governs, not whether the contract contains terms or provisions related to the claim." (citations omitted)); *see also Guinn v. Hoskins Chevrolet*, 836 N.E. 2d 681, 704 (Ill. App. 1st Dist. 2005) (the doctrine of unjust enrichment has no application where a specific contract governs the relationship of the parties); *Nesby v. Country Mutual Insurance Company*, 805 N.E.2d 241, 243 (Ill. App. 5th Dist. 2004).

\*     \*     \*

For the foregoing reasons, the defendants' motion for summary judgment is granted with respect to the § 1983 and unjust enrichment theories, and it is denied with respect to the breach of contract theory. The plaintiffs may proceed on a class-wide breach of contract theory based on the

defendants' purported breach of Poe Manor residential leases from January 1, 2011, to April 22, 2019.

Dated: November 23, 2022

John J. Tharp, Jr.
United States District Judge